UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| DOUGLAS A. KELLEY, *in his capacity as the Trustee of the PCI Liquidating Trust,* | Civil No. 20-642 (JRT) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| SAFE HARBOR MANAGED ACCOUNT 101, LTD., | |
| Defendant. | |

Shira R. Isenberg and Neal H. Levin, **FREEBORN & PETERS LLP**, 311 South Wacker Drive, Suite 3000, Chicago, IL 60606; Stacey A. Broman, **MEAGHER & GEER, PLLP**, 33 South Sixth Street, Suite 4400, Minneapolis, MN 55402, for plaintiff.

Michael C. Markham, Frank R. Jakes, and Angelina E. Lim, **JOHNSON POPE BOKOR RUPPEL & BURNS, LLP**, 401 East Jackson Street, Suite 3100, Tampa, FL 33602; Thomas C. Atmore, **MARTIN & SQUIRES, P.A.**, 332 Minnesota Street, Suite W2750, St. Paul, MN 55101, for defendant.

Plaintiff Douglas A. Kelley, acting as the trustee of PCI Liquidating Trust in its bankruptcy proceedings, filed this action against Defendant Safe Harbor Managed Account 101, Ltd. ("Safe Harbor") to recover $6,898,923.39 that had been transferred from Arrowhead Capital Management Corp. ("Arrowhead") to Safe Harbor. Kelley's action comes after a bankruptcy court entered default judgment against Arrowhead and avoided approximately $1 billion in transfers Arrowhead received from Metro I, LLC

(formerly known as Metro Gem Capital, LLC and hereinafter "Metro"), including the funds that Arrowhead later transferred to Safe Harbor, as part of the multi-billion-dollar Ponzi scheme orchestrated by Tom Petters.

Safe Harbor moved for summary judgment, arguing that the transfers it received from Arrowhead were protected by Section 546(e) of the Bankruptcy Code because it involved a financial institution, and it was in connection with a securities contract. The Court agreed and granted summary judgment. On appeal, the Eighth Circuit affirmed the Court's finding related to Section 546(e). However, because the Eighth Circuit found that the Court had conflated two entities in its analysis, the Circuit remanded to the Court for further determination of whether the transfers were in connection with the Note Purchase Agreement the Court had deemed a securities contract.

The Court concludes that the transfers at issue were done in connection with the Note Purchase Agreement because the record shows the Credit Agreement and promissory notes under which the transfers were initiated were part of an integrated transaction involving the Note Purchase Agreement. Additionally, the Court concludes the record reflects that but for the Note Purchase Agreement, the transfers would not have occurred. Thus, the Court will grant Safe Harbor's summary judgment motion.

## BACKGROUND

I. **FACTUAL BACKGROUND**

The Court has previously detailed all relevant facts in this case in its first Order for Summary Judgment.  *See Kelley v. Safe Harbor Managed Account 101, Ltd.*, No. 20-642, 2020 WL 5913523, at *1 (D. Minn. Oct. 6, 2020).  The Court will briefly recount the facts relevant to the narrow dispute at hand.

### A. The Parties and Relevant Non-Parties

Plaintiff Douglas A. Kelley is the Trustee of the PCI Liquidating Trust established pursuant to the bankruptcy proceedings in *In re Petters Company, Inc. et al.*, Case No. 08-45257. (Compl. at 1, Mar. 3, 2020, Docket No. 1-1.)  Defendant Safe Harbor is a Florida limited partnership. (*Id.* ¶ 8.)

The Petters Company, Inc. ("PCI") was a Minnesota corporation that was wholly owned by Tom Petters at all relevant times. (*Id.* ¶¶ 1–2, at 2.)  MGC Finance, Inc. ("MGC Finance") was a wholly owned subsidiary of PCI that served as a special purpose entity, which was used by Petters to carry out fraudulent activities. (*Id.* ¶ 3, at 2.)

Arrowhead Capital Management Corp. ("Arrowhead") is a Delaware corporation with its principal place of business in Minnesota. (*Id.* ¶ 5, at 2; *see also* Decl. of Michael C. Markham ("Markham Decl."), Ex. 2, at 16, Mar. 30, 2020, Docket No. 22-2.)  Arrowhead made its investments through the ACP II Fund, of which it was the sole general partner. (Compl. ¶¶ 4–6, at 2–3.)

Metro I, LLC ("Metro"), formerly known as Metro Gem Capital, LLC, was a special purpose entity of Arrowhead. Its sole purpose was to facilitate transfers from Arrowhead to PCI through MGC Finance. (*Id.* ¶¶ 6–7, at 3.)

**B. The Transfers**

On July 18, 2001, MGC Finance entered into a Credit Agreement with Metro, which provided that Metro would make loans to MGC Finance for the stated purpose of financing the account receivables from the purported sale of electronic goods. (Compl., Ex. A, ¶ 114, at 71.) On the same day, Arrowhead and Metro entered into a Note Purchase Agreement under which the promissory notes that Metro received from MGC Finance were transferred directly to and held for the benefit of Arrowhead. (*Id.* ¶ 11, at 3–4.)

Safe Harbor invested a total of $6 million in Arrowhead in 2002. (Decl. of Dean G. Tanella ("Tanella Decl.") ¶¶ 2–3, Mar. 30, 2020, Docket No. 23.) Safe Harbor wired funds into a Wells Fargo account, which Arrowhead then used to purchase the MGC Finance Notes from Metro. (Markham Decl., Ex. 2, at 25.) When Arrowhead received payments from MGC Finance on the notes, the funds would flow back to repay investors such as Safe Harbor. (Markham Decl., Ex. 1 ("Martens Dep."), 23:17–24:24, Mar. 30, 2020, Docket No. 22-1.) In 2003, Safe Harbor redeemed its investment in Arrowhead and received two wire transfers totaling nearly $6.9 million from MGC Finance to the Wells Fargo account. (Compl., Ex. C, at 239.)

In 2008, it was discovered that Metro was one of many special purpose entities set up by Petters and PCI to perpetuate a multi-billion-dollar Ponzi scheme. (Martens Dep. 23:17–24:7, 93:17–94:9.) Petters was criminally prosecuted, convicted, and sentenced to 50 years in federal prison. (Compl. ¶ 35, at 8.) Plaintiff Kelley was appointed as the Trustee of the PCI Liquidating Trust. (*Id.* at 1.)

## II. PROCEDURAL BACKGROUND

On August 25, 2017, Kelley filed this action against Safe Harbor in Bankruptcy Court, alleging that the transfers from Arrowhead to Safe Harbor in the amount of $6,898,923.39 were recoverable under 11 U.S.C. §§ 550, 551 and Minn. Stat. § 513.48(b). (*Id.* ¶¶ 93–97, at 42.)

Safe Harbor moved for summary judgment and argued that the transfers to Safe Harbor are immune from Kelley's avoiding power pursuant to § 546(e) of the Bankruptcy Code. *Kelley*, 2020 WL 5913523, at *2. The Court agreed that Safe Harbor is immune under § 546(e) of the Bankruptcy Code, finding that Arrowhead was a financial institution, that the Note Purchase Agreement was a securities contract, and that the transfers were made in connection with the Note Purchase Agreement. *Id.* at *4–5.

Kelley appealed the Court's decision to the Eighth Circuit. The Eighth Circuit affirmed the Court's finding that Arrowhead was a financial institution and that Wells Fargo acted as its custodian. *Kelley v. Safe Harbor Managed Account 101, Ltd.*, 31 F.4th 1058, 1064–66 (8th Cir. 2022). The Eighth Circuit also affirmed the finding that the Note

Purchase Agreement was a securities contract. *Id.* at 1066–67. However, the Eighth Circuit determined that the Court confounded two of the entities (Metro and MGC Finance) in its analysis by treating them as the same entity. *Id.* at 1067. This was consequential because the relevant transfers were from MGC Finance to Arrowhead, and not from Metro. *Id*. at 1067–68. And it was Metro that was party to the Note Purchase Agreement, which was the primary basis for the Court's conclusion that the transfers were in connection with the Note Purchase Agreement.[1] *Id.* Thus, because MGC Finance made the transfers, and because MGC Finance was not party to the Note Purchase Agreement, the Eighth Circuit remanded to the Court to determine whether the transfers from MGC Finance were nevertheless "in connection with" the Note Purchase Agreement. *Id.* at 1068.

## DISCUSSION

**I.   STANDARD OF REVIEW**

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of

---

[1] In the Summary Judgment Order the Court stated, "[b]ecause there is no dispute that the transfer Kelley is seeking to avoid (from Metro to Arrowhead) was made 'in connection' with the Note Purchase Agreement, the transfer qualifies for § 546(e)'s exception." *Kelley*, 2020 WL 5913523, at *5. But the transfer was in fact from MGC Finance to Arrowhead. *Kelley*, 31 F.4th at 1067.

law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party may not rest on mere allegations or denials but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256 (citing Fed. R. Civ. P. 56(e)).

## II.  ANALYSIS

The issue on remand is narrow. The question before the Court is whether the transfers from MCG Finance to Arrowhead were in connection to the Note Purchase Agreement between Arrowhead and Metro. Section 546(e) of the Bankruptcy Code only shields the transfers to Safe Harbor if the transfers are made "in connection with a securities contract." The Court has already concluded that the Note Purchase Agreement is a securities contract.

Kelley first argues that the transfers were not made in connection with the Note Purchase Agreement but rather pursuant to a separate Credit Agreement and promissory notes that MGC Finance issued to Metro.[2] Kelley also argues that the Credit Agreement and the promissory notes are not securities contracts.[3]

The Court first addresses the role of the Credit Agreement and the promissory notes in this case. Safe Harbor does not dispute that the transfers were made pursuant to the Credit Agreement and the promissory notes. But that does not settle the inquiry because the transfers may be related to the Note Purchase Agreement even if they are also governed by a Credit Agreement and promissory notes. Additionally, Safe Harbor contends that the Credit Agreement itself is related to the Note Purchase Agreement, which would mean the transfers pursuant to the Credit Agreement would also be.

The Eighth Circuit explained that "[i]n the context of § 546(e), a transfer is 'in connection with' a securities contract if it is '**related to**' or '**associated with**' the securities contract" and that there is a "low bar for the required relationship between the securities

---

[2] The only mention of the Credit Agreement and promissory notes on the record is the second amended complaint in bankruptcy court, which was attached as an exhibit to the Complaint in this case, and which states that "on or about July 18, 2001, Metro I entered into a Credit Agreement with MGC Finance" and that each investment "was evidence by a promissory note." (Compl., Ex. A, ¶ 114, at 71.)

[3] Kelley re-argues that the Note Purchase Agreement is not a securities contract, but the Court has already decided this issue and the Eighth Circuit affirmed that finding. *See* Kelley, 31 F.4th at 1065–66.

contract and the transfer sought to be avoided." *Kelley*, 31 F.4th at 1068 (emphasis added) (quoting *In re Madoff*, 773 F.3d 411, 421–22 (2nd Cir. 2014).

Here, the record shows that the transfers from MGC Finance to Arrowhead were related to the Note Purchase Agreement because the Credit Agreement that governed the transfers was part of an integrated transaction which included the Note Purchase Agreement. Additionally, there is no genuine dispute that but for the Note Purchase Agreement the transfers would not have occurred, meaning that the two were related.

The Court finds that the Credit Agreement and the Note Purchase Agreement were part of an integrated transaction. Each of the following was signed on July 28, 2001: the Credit Agreement; a Security Agreement between Petters and Metro; a Sale Agreement; a Sales and Servicing Agreement; the Note Purchase Agreement; the Custodial Agreement, and the Collateral Account Agreement. (Compl., Ex. A ¶¶ 114–16, 118–19, at 71–72; Markham Decl., Ex. 6, at 17, 62, Docket No. 22-6.) Given the role that all of these agreements and entities played in the Ponzi scheme, it is not surprising they were created at the same time and are related to each other.

Kelley does not dispute that these agreements were entered into on or about the same date. Instead, Kelley argues that the issue of whether the transfers were related to the Note Purchase Agreement must be sent to the jury. However, at the summary judgment stage the nonmovant must do more than claim there is a dispute of fact, there must be some evidence put forth that a jury could use to find for the nonmovant.

*Anderson*, 477 U.S. at 256 (citing Fed. R. Civ. P. 56(e)).  Furthermore, it appears that Kelley also thought that the transfers were related to the Note Purchase Agreement.[4]  In fact, Theodore F. Martens—an expert on behalf of Kelley—was asked whether "it is fair to assume that those transfers were made in connection with this note purchase agreement," and he replied, "I believe that to be the case."  (Martens Dep. 133:5–133:17.)

Given the "low bar" needed to find a connection between the transfers and the Note Purchase Agreement, the Court concludes that no reasonable jury could find that the transfers from MGC Finance to Arrowhead were not related to the Note Purchase Agreement between Arrowhead and Metro.  Ultimately, the Court finds that this is a matter of common sense.  The record reflects that but for the Note Purchase Agreement, there was no reason for the transfers from MGC Finance to Arrowhead, and subsequently to Safe Harbor.  Kelley advances no facts to support an inference that the transfers at issue were for a reason other than the existence of the Notes Purchase Agreement.

---

[4] Before the connection between the transfers and the Notes Purchase Agreement became the key issue in this dispute, the question was whether the transfers were in connection with any securities agreement.  While arguing that the Note Purchase Agreement was not a securities agreement, Kelley acknowledged that, as its Complaint puts forth, "the transfers were in connection with a Note Purchase Agreement."  (Pl.'s Rep. Mot. Summ. J., May 8, 2020, Docket No. 29.)

Therefore, the Court finds that there is no dispute that the transfers were related to the Note Purchase Agreement and the subsequent transfers to Safe Harbor are immune under § 546(e).[5]

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Safe Harbor's Motion for Summary Judgment [Docket No. 20] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: February 6, 2023
at Minneapolis, Minnesota.

　　　　　　　　　　　　　　　　　　JOHN R. TUNHEIM
　　　　　　　　　　　　　　　　　　District Judge
　　　　　　　　　　　　　　　　　　United States District Court

---

[5] The Court does not consider whether the Credit Agreement and promissory notes themselves are also securities contracts because this determination is unnecessary to settle the present dispute.